UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

PHYLLIS M. FLEMING,                )
                                   )
          Plaintiff,               )
                                   )     No. 1:10-CV-134
v.                                 )
                                   )     Chief Judge Curtis L. Collier
CITY OF CHATTANOOGA, *et al.*,      )
                                   )
          Defendants.              )

## M E M O R A N D U M

Plaintiff Phyllis M. Fleming ("Plaintiff" or "Fleming") filed suit against the City of

Chattanooga ("City") and Chattanooga Police Officers Brian Angel, Jonathan Brock, and Mike

Wenger (collectively "Officers")[1] under 42 U.S.C. § 1983 and various Tennessee state law causes

of action. Now before the Court are motions for summary judgment filed by the City (Court File

No. 38) and the Officers (Court File No. 43). Plaintiff filed a consolidated response to both motions

(Court File No. 47), and neither the City nor the Officers replied to Plaintiff's response. For the

reasons discussed below, the Court will **GRANT** summary judgment for the City and the Officers

on Plaintiff's § 1983 claim, and will **DISMISS WITHOUT PREJUDICE** Plaintiff's state law

claims.


## I.      FACTUAL & PROCEDURAL BACKGROUND

This case arises out of an incident that occurred after midnight during the Memorial Day

weekend in May 2009. On May 24, 2009, Plaintiff Phyllis Fleming was staying at the home of

---

[1] Officers Angel, Brock, and Wenger are sued in their individual and official capacities.
Plaintiff also initially named Officer Gorgas Rios and Officer Pete Miller, but all parties stipulated
to dismissals of these two individuals (Court File Nos. 20, 21).

Willie Long on Orchard Knob Avenue in Chattanooga, Tennessee. Although Fleming does not reside there, she is a frequent overnight guest at Long's home (Court File No. 47, Long Aff., ¶ 3), spending more time there than at her own home (Court File No. 47, Fleming Dep., p. 45). Fleming possesses a set of keys to Long's residence, which is also inhabited by Long's mother, for whom Fleming has provided care and assisted in various ways (Court File No. 47, Long Aff., ¶ 3).

While Fleming and Long were watching television at Long's home, they heard loud shouting outside. Long then went outside to investigate, and encountered James Percy, who was yelling obscenities at Long's elderly next-door neighbor. It appeared Percy believed that neighbor owed him $10, and Percy allegedly threatened "he was going to kill somebody for his $10" (Court File No. 47, Fleming Dep., p. 19). Long asked Percy to leave, and promised to pay him $20 if Percy would leave and return on Monday.[2] At this point, Percy followed Long back to Long's residence, and began yelling at Long. Although Long then returned inside to watch television, Percy's yelled obscenities remained audible. Long again went outside, and shortly thereafter came back into the house. Fleming, who throughout this period was watching television, believed the altercation had been resolved (*id.* at p. 20).

It had not. Instead, Long had returned inside his house to retrieve a rifle, which he used to scare off Percy, who had, according to Fleming, entered a screened-in porch area at Long's residence. Long allegedly "fired a couple of shots in the air," which had the intended effect, as Percy "took off running down the street" (*id.* at p. 21). Percy appears to have then called 911 from a payphone at a gas station (Court File No. 47, Angel Dep., pp. 90-91). Officer Brian Angel

---

[2] The record is unclear whether Long owed Percy any money or Long simply offered to pay Percy in order to convince him to leave the area.

2

responded to the "shots-fired" call, and, after having picked up Percy from the gas station, drove over to Long's residence. Upon arriving at Long's house, Angel observed on the ground both a spent and a live casing, which he understood to be evidence supporting Percy's claim he had been shot at (*Id.* at p. 92).[3]

The record provides scant detail of what exactly happened next. It appears Officers Mike Wenger and Jonathan Brock also arrived at the scene. The Officers asked Long to step outside the house, and he complied.[4] Shortly thereafter, the Officers arrested Long (Court File No. 47, Long Aff., ¶ 7). One of the Officers requested Long's consent to search his house, and he refused, insisting the Officers first obtain a search warrant. At this point, Fleming appears to have come to a door in Long's residence that opened onto the enclosed porch where Long and the Officers were located. She may have been drawn by Long yelling to her to come and see what the Officers were doing to Long (Court File No. 47, Fleming Dep., p. 21). Coming to the doorway, Fleming observed Long seated in handcuffs in the enclosed porch area (*id.* at p. 23). Long was apparently also yelling to Fleming not to permit the Officers to enter the residence until they had secured a search warrant (*id.* at p. 27; Court File No. 47, Long Aff., ¶ 7).

---

[3] Officer Angel also indicated a live casing was found on Long's person after he had been detained (Court File No. 47, Angel Dep., p. 92).

[4] In their brief, the Officers claim Long did not in fact comply. *See* Court File No. 44, p. 2 ("Angel commanded Long to exit the porch and show his hands. Long did not comply. Angel and Brock quickly made contact and cuffed Long."). In fact, all the evidence on this issue in the record, including the deposition testimony of both Officers Brock and Wenger, suggest precisely the opposite. *See* Court File No. 44, Wenger Dep., p. 30 ("[Long] came out willingly and was placed into custody."); Court File No. 44, Brock Dep., p. 16 ("Q: Now, did [Long] voluntarily come out to you? A: Yes."); *cf.* Court File No. 47, Long Aff., ¶ 7 ("The police arrived soon thereafter. They asked me to come outside, and after talking to me, arrested me."). Moreover, nothing in the record suggests Long did not comply with the Officers' orders.

3

Fleming claims she came to the doorway, but did not enter the porch area. Instead, she "turned the doorknob just to see what [the Officers] were doing" (Court File No. 47, Fleming Dep., p. 21). According to Long, Fleming, at this point, "was standing inside the front door with the security door shut" (Court File No. 47, Long Aff., ¶ 7). Officer Brock, however, testified at his deposition the door was open–albeit at less than a ninety degree angle–and he, after asking Fleming to step onto porch while the Officers secured a search warrant (Court File No. 44, Brock Dep. p. 22), in some manner prevented Fleming from closing the door (*id.* at pp. 24-28).

When Fleming refused to move from the doorway, two or three of the Officers at the scene "grabbed" Fleming, "spun [her] around, and "slammed [her] down on [a] little bench" located in the enclosed porch area (Court File No. 47, Fleming Dep., pp. 30-31).[5] She was then placed in handcuffs by Officer Gorgas Rios, who had by that time arrived on the scene.[6] Fleming did not resist. Despite descriptions in Fleming's complaint that the Officers "beat and batter[ed]" her (Court File No. 13, Amended Complaint, ¶ 23), Fleming clarified at her deposition the Officers did not punch or strike her with either fists or their police batons, and did not use a taser or mace on her. After being handcuffed, Fleming was taken by the Officers to a patrol car, where she remained for a couple of hours.

While Fleming was in the patrol car, a Sergeant Blanton[7] approached her and asked her

---

[5] In explaining why multiple police officers were involved in removing Fleming from the doorway, Officer Angel, who weighed approximately 185 pounds at the time of the incident, explained Fleming is a "larger woman" (Court File No. 47, Angel Dep., p. 79). Fleming, at the time, stood approximately 5'10" inches and weighed approximately 230 pounds.

[6] Officer Pete Miller had apparently also arrived at the Long residence by the time Fleming was handcuffed.

[7] The record does not disclose Sergeant Blanton's first name.

4

whether she needed medical treatment, offering to call an ambulance to transport her to a hospital. Although Fleming refused this offer, citing the expense she would incur, she did request Blanton to loosen her handcuffs. Blanton instructed one of the Officers to place Fleming in two sets of handcuffs, which occurred. Finally, before Fleming was transported to the station, Blanton reportedly said to the other Officers "the four of you-all need to get your s--- together . . . because [Fleming is] going to be a problem . . . especially the way her arms look" (Court File No. 47, Fleming Dep., p. 43). Fleming was then booked at the station, and placed in jail. She was released from jail the following day.

Fleming suffered significant bruising and a torn rotator cuff as a result of this incident (*id.* at pp. 63-67). She required surgery and physical therapy to recover (*id.* at pp. 70-71), and, after using all her sick leave and vacation, had to take unpaid leave from her job in the Tennessee Department of Human Services (*id.* at p. 84).

Although not related to the incident out of which her claims arise, Fleming also attaches to her response to the summary judgment motions a protection order secured by Sarah Coleman, a former girlfriend of Officer Angel's, against Angel. The order was granted following Coleman's allegations Angel was following her, was driving by her house, and had other law enforcement officers pull her over (Court File No. 47, ex. 4, p. 2-3). Angel denies these allegations (Court File No. 47, Angel Dep., pp. 61-62), and the Chattanooga Police Department ("CPD")'s internal affairs investigation determined Coleman's allegations were unfounded (*id.* at p. 54).

In May 2010, Fleming commenced this action against the City of Chattanooga and the Officers. After the close of discovery, the City and the Officers filed motions for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2-3 (E.D. Tenn. Nov. 4, 2009) (explaining the Court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could

not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    DISCUSSION

Fleming contends the conduct of the Officers during the late May 2009 incident amounts to a violation of federal and Tennessee state law by the City of Chattanooga and the Officers. Her federal claim, brought under 42 U.S.C. § 1983, alleges violations of her right to be free from unlawful seizures and excessive force secured by the Fourth and Fourteenth Amendment of the United States Constitution, and violations of her right not to be deprived of liberty[8] without due process under the Fourteenth Amendment.[9] In her response to the summary judgment motions, Fleming wisely focuses only on her unlawful seizure and excessive force claims. *See Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010) ("[I]f the plaintiff was a free person at the time of the

---

[8] Fleming's Amended Complaint claims a violation of her right "not to be deprived of life, liberty, or property without Due Process (Court File No. 13, Amended Complaint, ¶ 46(b)). Because Fleming is still alive and has not identified any property interest at issue in this case, Fleming could only be alleging the violation of a liberty interest.

[9] In one paragraph in the "Factual Basis of Complaint" section of her Amended Complaint, Fleming asserts the Officers acted "without just reason, and in concert with one another" (Court File No. 13, Amended Complaint, ¶ 23). Fleming further states the Officers' "actions and omissions . . . constitutes a conspiracy violation of this law" (*id.* at ¶ 46) The City and Officers appear to construe this language as a claim advanced under 42 U.S.C. §1985, which prohibits conspiracy to interfere with civil rights. *See* Court File No. 42, pp. 14-15; Court File No. 44, p. 18. The Amended Complaint itself does not once refer to 42 U.S.C. § 1985, and neither does Fleming's response to the summary judgment motions. In brief, Fleming has neither pleaded a § 1985 claim nor responded to the City's and the Officers' argument regarding a possible § 1985 claim. Because conspiracy claims must be pleaded "with some degree of specificity" and "vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983," *Guiterrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987), or under § 1985, *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984), the Court will not construe Fleming's Amended Complaint as having advanced a conspiracy claim under either § 1983 or § 1985.

7

incident and the use of force occurred in the course of arrest or other seizure of the plaintiff, the

plaintiff's claim is governed by the Fourth Amendment's reasonableness standard.") (citing *Phelps*

*v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002)).[10]  Accordingly, the Court will consider Fleming's

§ 1983 claim under the Fourth Amendment.

### A.    §1983 Claim

Fleming's Amended Complaint alleges the City and the Officers, both individually and as

law enforcement officers, violated 42 U.S.C. § 1983. To state a general claim under § 1983, a

plaintiff must "demonstrate that a person acting under color of state law 'deprived him of rights,

privileges or immunities secured by the Constitution or laws of the United States.'" *Barker v.*

*Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citing *Bennett v. City of Eastepointe*, 410 F.3d 810,

817 (6th Cir. 2005)).  When a party brings a suit for damages against an officer in his official

capacity, it is construed as a suit against the governmental entity.  *Will v. Michigan Dep't of State*

*Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  A suit

against a municipality involves a two-prong inquiry.  *Cash v. Hamilton Cnty. Dep't of Adult Prob.,*

388 F.3d 539, 542 (6th Cir. 2004).  The court must determine: 1) whether the plaintiff has been

deprived of a constitutional right; and 2) whether the municipality is responsible for the violation.

*Id*.

A municipality cannot be liable under a *respondeat superior* theory for § 1983 violations.

---

[10] To the extent Fleming's Amended Complaint states a substantive due process claim, she would have to demonstrate the Officers' conduct "shocks the conscience" or otherwise "interferes with rights implicit in the concept of ordered liberty."  *United States v. Green*, 654 F.3d 637, 652 (6th Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).  Fleming has made no argument to this effect, nor cited any case in support of this proposition.  Accordingly, the Court concludes summary judgment is proper for the City and the Officers on Fleming's substantive due process claim.

*Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Rather, municipalities are liable when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash*, 388 F.3d at 542 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). A § 1983 plaintiff can draw from one of four sources to establish a municipality's liability for an illegal custom or policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)). A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001).

Failure to adequately train or supervise officers can rise to the level of a *de facto* unconstitutional policy or custom if a plaintiff can show: "(1) the training or supervision [] was inadequate to the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Loggins v.*

*Franklin Cnty.*, 218 F. App'x 466, 473 (6th Cir. 2007) (quotation omitted).

### 1. Claim Against City of Chattanooga and Officers in Their Official Capacity

Because § 1983 claims against law enforcement officers are construed as suits against the government entity, *Matthews*, 35 F.3d at 1049, the Court will construe Fleming's claims against the Officers in their official capacity as causes of action against the City. Fleming offers a laundry list of allegations against the City. She asserts the City fails to train its officers properly, fails to staff its police department sufficiently, has a policy or custom of improperly investigating citizen complaints, has a policy or custom of tolerating abuse of suspects, and a policy or custom of retaining officers it knows to have a history of abusing citizens. These various failures and improper customs, Fleming further avers, constitute deliberate indifference. The City responds Fleming cannot satisfy the stringent deliberate indifference standard, and provides no evidence of any unconstitutional policy, custom, or practice carried out by the City.[11] The Court agrees with the City.

Fleming's claim against the City fails because she does not offer evidence of any illegal policy, practice, or custom. Although Fleming has no shortage of theories in her Amended Complaint and her response to the summary judgment motions, she does not ground those theories in any evidence. By contrast, the City offers affidavits from Susan Blaine, Captain of the Internal Affairs Division of the CPD (Court File No. 39), and Danna Vaughn, Lieutenant in charge of the CPD's Training Division (Court File No. 40). These affidavits directly contradict Fleming's claims

---

[11] The City also argues it cannot be held liable under a *respondeat superior* theory. Because the law on this point is clear, *Spears*, 589 F.3d at 256 n.6, and because Fleming does not invoke *respondeat superior* in either her Amended Complaint or her response to the summary judgment motions, the Court concludes the City cannot be held liable under such a theory.

10

the City failed to train or supervise or otherwise oversee its police officers. Captain Blaine makes clear that at the time of the incident "police officers were supervised and disciplined if they did not follow proper search and seizure procedures, arrest procedures, use of force procedures or rendering of medical aid procedures" (Court File No. 39, Blaine Aff., ¶ 3). Blaine further states "[t]he records of the Internal Affairs Division do not establish that Officers Angel, Brock, or Wenger were negligently supervised or negligently trained in proper police tactics" (*id.* at ¶ 11). Lieutenant Vaughn reviewed the training records of Officers Angel, Brock, and Wenger, and confirmed all three had received updated annual training, and in each case, the Officers had "met or exceeded training requirement of the Tennessee Post Commission" (Court File No. 40, Vaughn Aff., ¶¶ 3-5). Fleming does not controvert these affidavits.

The only "evidence" of an unconstitutional policy, custom, or practice Fleming submits to the Court is the protective order secured by Sarah Coleman against Officer Angel. Notwithstanding the significant threshold question of the admissibility of this evidence at trial under either Fed. R. Evid. 401 or 404(b), Fleming does not adequately explain how this protective order demonstrates an unlawful policy, custom or practice implemented by the City. Citing nothing in the record, Fleming claims the City failed to "fully make clear to Angel his status during the litigation of the protective order" (Court File No. 47, p. 13). Fleming further claims the City performed nothing other than an "informal" investigation of a separate rape charge against Angel,[12] and therefore, these two incidents "created the atmosphere (at least for Angel) that he could do what he wanted, and his

---

[12] Fleming submits no evidence of this "rape charge," although Angel did discuss in his deposition a complaint made against him "about a situation where [Angel] had a sexual act with a female" (Court File No. 47, Angel Dep., p. 34). The matter was investigated but not written up (*id.* at p. 35-36).

daddy's connections[13] with the City will shield him no matter to [sic] the severity of his misconduct" (*id.* at 13-14). Not only is the evidence, even when construed in the light most favorable to Fleming, inadequate to support Fleming's argument Angel could act with impunity; it also fails to explain why this allegedly illegal policy or custom would also permit Officers Brock and Wenger to act with impunity.

Finally, Fleming has not demonstrated a single element of the three-part showing required to establish a failure-to-train or failure-to-supervise claim. *Ellis*, 455 F.3d at 700. As the plaintiff, Fleming has the burden of producing evidence that meets this requirement. Although the City is not required to produce evidence, the Court notes the City has furnished affidavits contradicting Fleming's unsupported assertions. The affidavits from Blaine and Vaughn indicate the Officers received adequate training and supervision. Even if the Court were inclined to disbelieve these affidavits—which it is not—Fleming has not presented any evidence indicating inadequate training or supervision resulted from the City's deliberate indifference or that such inadequacy was closed related or otherwise caused Fleming's injury. Indeed, these affidavits highlight Fleming's failure to submit proof. In brief, Fleming has simply not shown any "deliberate indifference" on the part of the City. Accordingly, summary judgment in favor of the City and the Officers in their official capacity is appropriate.[14]

---

[13] Fleming presents no evidence of Angel's father's role or connection, if any, with the City.

[14] In its brief, the City argues it is also entitled to summary judgment for Fleming's claim of failure to provide medical care under 42 U.S.C. § 1983. In fact, other than a single sentence in her Amended Complaint contending there was "needless delay in rendering aid to the plaintiff" (Court File No. 13, Amended Complaint, ¶ 38), Fleming does not appear to advance this claim. She does not discuss such a claim in her response to the summary judgment motions and does not cite the Eighth Amendment—under which denial of medical care claims are considered, *see Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011)—in either her Amended Complaint or her response

## 2.       Claim Against Officers in Their Individual Capacity

To Fleming's § 1983 claim against them in their individual capacity, the Officers raise a qualified immunity defense.  The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful."  *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The plaintiff bears the burden of showing a defendant is not entitled to qualified immunity.  *See Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

To determine if qualified immunity applies, courts employ a two-part test.  First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Second, if a Constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known."  *Peete v. Metro. Gov't of Nashville and Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (citation omitted); *see also Saucier*, 533 U.S. at 201.  This second inquiry looks closely at the particular context of the case rather than asking whether a right was clearly established "as a broad general proposition."

---

motion.  Moreover, the record indicates Sergeant Blanton offered to call Fleming an ambulance at the scene.  Thus, to the extent Fleming's Amended Complaint can be construed to state a denial of medical care claim, summary judgment on that claim is also appropriate.

13

*Saucier*, 533 U.S. at 201. If a plaintiff fails to establish either of these prongs, she has failed to carry her burden and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).[15]

Following the Supreme Court's decision in *Pearson v. Callahan*, a district court may address either prong first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Noting "there will be cases in which a court will rather quickly and easily decide that there was no violation of established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all," *id.* at 239, the Supreme Court decided federal district courts should exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *id.* at 236. *Pearson* thus removed the rigid two-step analysis to avoid "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* at 236-37.

This case illustrates the wisdom of *Pearson*'s holding. Here, the question of whether the conduct of Officers Angel, Brock, and Wenger, taken in a light most favorable to Fleming, violated her constitutional rights under the Fourth Amendment poses a genuinely difficult question. The proper test under the Fourth Amendment is the reasonableness touchstone, which in this context "requires careful attention to the facts and circumstances of each particular case, including the

---

[15] Because qualified immunity shields reasonable conduct, even when it is mistaken, the Sixth Circuit has at times added a third line of inquiry to the traditional two-part test: "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Peete*, 486 F.3d at 219; *cf. Everson v. Leis*, 556 F.3d 484, 494 n.4 (6th Cir. 2009) (stating regardless of whether the two-prong or the three-prong test is applied, "the essential factors considered are [] the same"). "[I]f officers of reasonable competence could disagree [on the legality of the action], immunity should be recognized." *Malley*, 475 U.S. at 341.

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Although the factors above tend to support Fleming's argument her Fourth Amendment rights were violated, a close analysis of the factual circumstances in this case reveal non-trivial arguments in support of the reasonableness of the Officers' conduct.[16]

Rather than grapple extensively with the difficult question of whether the Officers' conduct violated Fleming's constitutional rights, however, the Court can resolve this case more easily and efficiently under the second-prong of the qualified immunity analysis. For a right to be clearly established under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Where, as here, a plaintiff is making an excessive force claim, she must not only demonstrate "an officer's use of force exceeded the objective standard of reasonableness," but must also show "'it would be clear to a reasonable officer' that his use of excessive force 'was unlawful in the situation he confronted.'"[17] *Champion*, 380 F.3d at 902 (quoting *Saucier*, 533 U.S. at 201-02). Thus, to demonstrate here the Officers unreasonably violated

---

[16] For example, CPD's operating standards for crime scenes provide officers with authority to conduct "protective fan-out searches" when they believe a perpetrator is inside (Court File No. 44, ex. 6). The Officers certainly believed–correctly–the rifle used in the shooting was still inside Long's residence, and may have believed an additional perpetrator remained inside the house. Additionally, given Fleming's size, the Officers may have been concerned she would overpower them. Taken together, these additional factors make the reasonableness determination a challenging constitutional question.

[17] In examining an officer's use of force, the "officer's subjective intentions are irrelevant to the Fourth Amendment inquiry." *Phelps*, 286 F.2d at 299 (citing *Graham*, 490 U.S. at 397).

Case 1:10-cv-00134-CLC-SKL   Document 57   Filed 11/28/11   Page 15 of 21   PageID #: 593

a clearly established right, she must show "the prior articulation of a prohibition against the type of excess forced exerted." *Id.*

Fleming has not made this showing. She argues instead 1) she had a reasonable expectation of privacy as an overnight guest under *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990); 2) the Officers, although permitted to conduct a protective sweep under *Maryland v. Buie*, 494 U.S. 325, 334 (1990), had no reason to enter Long's residence; and 3) the Officers' purported justification of securing the house until they could obtain a search warrant masked their unjustified anger at Fleming for refusing the Officers entry (Court File No. 47, p.10). All three of these arguments are largely beside the point. First, Fleming's status as an overnight guest is not a relevant aspect of an officer's calculus in deciding whether to use force, and if so, how much force to use. *See Graham*, 490 U.S. at 396 (discussing factors to consider in use of force claim). Moreover, nothing in the record indicates the Officers' conduct towards Fleming with regard to her arrest depended on whether or not they considered her an overnight guest. Second, Fleming's claim the Officers' had "no reason" to enter the house ignores the inconvenient fact the rifle Long had fired–the very reason the Officers arrived on the scene in the first place–remained unsecured in the house. Both *Maryland v. Buie* and the CPD operating standards for a crime scene provided justification for the Officers to secure the scene before searching the house. Finally, the third argument improperly focuses the analysis on the Officers' subjective intentions in deciding to use force to detain Fleming. *See Phelps*, 286 F.2d at 299 (citing *Graham*, 490 U.S. at 397).

Taken together, these three arguments do not establish that it should have been clear to Officers Angel, Brock, and Wenger that "[their] use of excessive force 'was unlawful in the situation

[they] confronted.'"[18] *Champion*, 380 F.3d at 902 (quoting *Saucier*, 533 U.S. at 201-02). When the Officers arrived on the scene, they had reason to believe the gun remained in the house, and justification to secure the scene until a search warrant to enter the house could be obtained. They further had grounds to insist Fleming not return inside, but rather remain outside, Long's residence. Allowing her to return inside risked permitting her to hide or dispose of the gun, or even to use the gun against the Officers themselves. When Fleming refused to exit Long's residence, two or three of the Officers sought to secure her by force. Given Fleming outweighed at least one Officer, and perhaps each of the Officers individually, it was reasonable for multiple Officers to engage her. Although it is without doubt unfortunate the manner in which the Officers placed Fleming in handcuffs resulted in bruises to her arms and a torn rotator cuff, Fleming has not pointed the Court to any caselaw indicating this conduct violated a clearly established right. In sum, because the Officers were neither "plainly incompetent" nor "knowingly violate[d] the law," they are protected by the qualified immunity defense. *Malley*, 475 U.S. at 341.

Perhaps the strongest argument Fleming can make–that the Officers used overly-tight handcuffs when detaining her, *see Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993),[19] also ultimately fails. The Sixth Circuit in *Champion* interpreted *Walton* to have "articulated a clearly established right to be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly." *Champion*, 380 F.3d at 902 (quoting *Walton*, 995 F.2d at 1342). The facts of *Walton*, however, suggest a narrowly-drawn right which does not apply here.

---

[18] In examining an officer's use of force, the "officer's subjective intentions are irrelevant to the Fourth Amendment inquiry." *Phelps*, 286 F.2d at 299 (citing *Graham*, 490 U.S. at 397).

[19] Fleming does not cite or discuss this case.

In *Walton*, an officer stopped Walton leaving her doctor's office–where she had received treatment for an injured shoulder–because she had not restrained her infant child in a car seat. *Walton*, 995 F.2d at 1333-34. The officer then determined Walton was driving with a suspended license, and proceeded to arrest her. *Id.* at 1334. Despite Walton's repeated entreaties not to be placed in handcuffs on account of her injured shoulder, the officer did so, and did not remove the handcuffs until Walton arrived at the police station. *Id.* The Sixth Circuit affirmed the district court's denial of summary judgment for the officer on qualified immunity grounds "because the facts are disputed as to whether [the officer] knew that Walton had a injured shoulder," and "[a]n excessive use of force claim could be premised on [the officer's] handcuffing Walton if he knew that she had an injured arm and if he believed that she posed no threat to him." *Id.* at 1342.

The facts here are considerably different than in *Walton*. Fleming never requested she not be placed in handcuffs, and certainly never informed the Officers she was suffering from any injury handcuffs might exacerbate (because she was not). *See O'Malley v. City of Flint,* 652 F.3d 662, 671 (6th Cir. 2011). The first time Fleming communicated her handcuffs were too tightly applied was to Sergeant Blanton (Court File No. 39, Fleming Dep., p. 39), and as soon as Blanton heard this, he instructed another officer to place her in two pairs of handcuffs to grant Fleming more movement. Fleming does insist the double pair of handcuffs was still applied tightly (*id.* at p. 39-40), but she does not appear to have communicated her discomfort to any law enforcement officers. *Cf. O'Malley*, 652 F.3d at 671 (finding no clearly established violation of constitutional law where plaintiff did not ask officer to loosen handcuffs). An excessive force claim against an official surely cannot succeed if the official has no reason to know excessive force is being applied. Moreover, unlike *Walton*, the Officers here had no reason to believe Fleming suffered from an injury or

18

otherwise opposed being placed in handcuffs.[20] Thus, Fleming's best argument the Officers violated a clearly established right–an argument she does not make herself–also falls short.

Because the facts construed in the light most favorable to Fleming do not show the Officers violated a clearly established right, qualified immunity for the Officers in their individual capacity is proper. This immunity thus bars Fleming's claims as to these Officers, and summary judgment for Officers Angel, Brock, and Wenger on Fleming's § 1983 claim is therefore appropriate.

**B.       State Law Claims**

Fleming also asserts a number of state claims against the City and the Officers. Specifically, she brings claims under negligence, negligence per se, common law assault and battery, and common law intentional infliction of emotional distress. As state law claims brought in a federal-question case, these claims can only be heard by the Court through the exercise of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. The exercise of federal supplemental jurisdiction is discretionary. District courts may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining

---

[20] To be sure, Fleming almost certainly would not have liked being placed in handcuffs. The relevant point, however, is that unlike Walton, Fleming did not communicate a legitimate reason to avoid handcuffs to the Officers.

jurisdiction.

28 U.S.C. § 1367(c). In making this discretionary decision, a district court should weigh "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *accord Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).

When all federal claims have been dismissed, the preferred disposition of state law claims is dismissal, or, where a case has come into federal court on removal, remand to state court. *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (citing *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)). A federal district court should only exercise its discretion to retain supplemental jurisdiction after dismissing federal claims under limited circumstances, which frequently involve some degree of forum manipulation. *See Carnegie-Mellon*, 484 U.S. at 357. There is no indication of manipulative tactics in this case, and no other compelling reason for the Court to retain supplemental jurisdiction over Fleming's state law claims. Accordingly, dismissal of these claims without prejudice is appropriate.

## IV. CONCLUSION

For the reasons discussed above, the Court will **GRANT IN PART** the City's motion for summary judgment (Court File No. 38), will **GRANT IN PART** the Officer's motion for summary judgment (Court File No. 43), and will **DISMISS WITHOUT PREJUDICE** Plaintiff's state law claims. There being no other issues in this case, the Court will **DIRECT** the Clerk of Court to **CLOSE** this case.

20

An Order shall enter.

/s/

**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**